I will call U.S. v. John C. Reynard Good morning, Your Honors. Steve Hopicek, Federal Defenders, on behalf of Mr. Reynard. I'd like to reserve five minutes for rebuttal. Your Honors, I think the first question that I'd like to address this morning is the question of what is precisely the precedential value of Kincaid. And then I'd like to move into the retroactivity issues because that does provide a statutory basis that this Court can resolve the constitutional issues with respect to the Fourth Amendment and the Commerce Clause analysis as well. I think that the issue of the precedential value of Kincaid does present a question of first impression for this Court. Are you familiar with our decision in Huggs, U.S. v. Huggs? Yes, I am, Your Honor. So how does this become first impression in light of that? Well, Your Honor, if carefully looking at Huggs, it appears that the defendant in that case, Mr. Huggs, didn't present this type of a claim. And I set up a 28-J letter last week quoting from the language in Huggs. But basically, according to the panel opinion in Huggs, Mr. Huggs raised Fifth Amendment due process claims and objected to the discretion given to his probation officer. And that's at page 768 of Huggs. And if I could quote, violates his constitutional rights because the condition is vague and would allow his probation officer too much discretion. That's at 768. Further, Mr. Huggs argued that, quote, violates his Fifth Amendment due process rights because it is vague and allows his probation officer too much discretion, close quote. So I think judging from the opinion that the claims that Mr. Huggs raised were not actually Fourth Amendment claims. So I think to the extent that the Huggs panel offered a view as to the, as to Kincaid, and I would point out that Huggs didn't really say anything about the issue that I'm raising today, which is what is the meaning of a 5-to-5 or 5-to-1-to-5 opinion. That issue isn't addressed in Huggs. But at any rate, I think that the Huggs Fourth Amendment discussion is dicta. And I understand that the Court has employed different definitions of dicta. Judge Tashima has one, and Judge Kaczynski has one. But I think it doesn't matter which way you slice it. And rarely the twain shall meet sometimes. It's a vigorous debate. But I think no matter which definition you apply, the Huggs mere citation to Kincaid would be dicta under either approach. I'd also point out that there's an interesting sidelight to the, that debate was in the Johnson case. The Judge Gould, who didn't supply the final vote to either of the five-judge blocks in Kincaid, also pointed out in his Johnson concurring opinion that it's up to subsequent panels to decide the presidential value of preceding panels when there are issues about whether or not a particular issue is part of the holding. So I think that issue is squarely before Your Honors. And I think that the — And I joined Reinhart's dissent, so where does that leave me? Well, I think Judge Tashima gets to make the law, because Judge Clifton joined Judge O'Scanlan's opinion. So it's really going to be up to Judge Tashima to decide which way to go on this issue. Well, I'm left out in the cold again. Well, no, Judge Tashima could join you in adopting Judge Reinhart's approach. I would just point out that with respect to the ultimate result in Kincaid, I think that this is sort of the paradigmatic example of the type of fractured opinion that the Supreme Court has declined to apply its own marks analysis to, because there really is no common ground between Judge Gould's opinion and Judge O'Scanlan's. I think as Judge Clifton just said, the 20 never met in that particular case. So to the extent that you need to find a lowest common denominator, and in fact, that's what the Nichols case from the Supreme Court talks about at page 745, so the lower courts could not find the lowest common denominator in the fractured Baldassare opinion, that they decided not to follow it. And Judge Souter's concurrence, which I think is really, from our perspective, the most important point in Nichols, said that basically the court was in equipoise as to the legal issues in Baldassare, because you had two, four justice blocks, and no one actually resolved the tie. And I think we have the same thing here. You've got five judge blocks that disagree on the totality of circumstances analysis. You have one judge who applied the special needs test, and then you have five judges who disagreed with the special needs analysis. And I think that their position was well taken, because the Edmond and Ferguson cases both emphasize that, in fact, you need individualized suspicion when the test is one for ordinary law enforcement purposes, which, in fact, this is what we have here. So... But you don't have six judges saying that in Kincaid. Indeed, you appear to have six judges saying something opposite to that. Well, you have six judges voting to affirm the district court, and I think... Well, isn't that the common denominator? Well... Isn't implicit in that a statement to the effect that the position you're trying to put forward here today, and argued, I understand, before Kincaid came out, is not good law in this circuit? Well, I think that the Supreme Court could have taken the same approach as to Baldassare. You had four justices who went for Mr. Baldassare on one ground and one that went the other way, and they decided not to accord that precedential status, because it didn't actually have any sort of common ground between the two. So I think that's really what the issue is, is whether or not you can find common ground between the plurality and the concurring opinion. In Baldassare, you couldn't. The Supreme Court jettisoned that case, and Justice Souter described it as having no precedential value. And then in Kincaid, you have the situation where there's no common ground between the five-judge opinion and the one-judge opinion. In fact, oddly enough, I think that the Ninth Circuit law does require reasonable suspicion for probation-type searches in the Goua-Gliardio case. And because Judge O'Scanlan's opinion is only joined by five judges total, Judge O'Scanlan's opinion could not overrule that case. So I think there's binding precedent that says you need reasonable suspicion for a probation-type search. And if that's the case, and Goua-Gliardio's never been overruled and wasn't cited in any of the many opinions in Kincaid, then this Court's also obligated to follow that. So I think — Well, I suggest that Mr. Kincaid should have walked and his conviction was affirmed. So I mean, I have — I understand where you're trying to come from, but I don't think Kincaid's resolve permits that. Well, I understand your position, Your Honor. I think that if the Court adopts Justice Souter's approach to this type of splintered opinion, then that wouldn't be the case. And whether or not this Court adopts Justice Souter's view, I think, is an open question that this panel gets to decide. Well, didn't he consent to this taking of blood? Mr. Raynard? Yeah. No, he didn't. Well, he signed something. The probation officer brought him a piece of paper and talked about all this and told him what the penalties were if he didn't submit to drawing blood. And he agreed to it. And he signed it. And he said, OK, I'm going to do it. Right. But what happened after that? Then he goes over there and his lawyer talked him out of it. Were you his lawyer? Yes. OK. So his lawyer talked him out of it, but he had already consented to it. Well, the blood draw — of course, the blood draw has never occurred. So to the extent — It never occurred, but he did consent to it. Well, to the extent that there was any viable consent there, it was withdrawn. I think under Rule 32.1, there needs to be a hearing and waiver of counsel before you can agree to any sort of unfavorable change in your supervised release conditions. And Mr. Raynard never waived his right to counsel. So to the extent that there's any consent still extant, it was certainly not viable under Rule 32.1. Unfavorable change in his supervised conditions. Didn't you have — we had that order out there as part of his parole that he would submit — it didn't say this specifically, but that he would submit whatever it was to the orders of the probation officer, et cetera, et cetera. There's no question that there was a search condition in Mr. Raynard's supervised release. But our position is that that search condition did not require him to provide a suspicionless forcible blood sample so that his DNA analysis could be undertaken. And in fact, to the extent that there's any consent at all, it certainly was revoked. With respect to the — I'd like to, if I could, segue into the Landgraf claim here, because I think this does provide a statutory way that this Court can avoid the constitutional issues. And it's a search if you take blood. Right. It's definitely a search if you take blood. Both parties agreed, and I think everybody agreed with that proposition in Kincaid as well. So I think that it's important to bear in mind the district court here found that this was not a statute that could only be read to apply retrospectively. It found that there was ambiguity in the statute as to whether or not it reached pre-enactment offenses. And I think the district court was correct in that assessment. If you look at the statute, it says that probation officers and Bureau of Prisons directors are supposed to take blood from defendants — from a defendant who is or has been convicted. Now, is does connote the present tense. So is could refer to convictions that occur after the person has already got the status of being in prison or on probation or parole or supervised release. And then has been could refer to the conviction that got the person in prison or on supervised release or probation or parole. But nothing in that language indicates an intention to relate back to offenses that were — that were committed prior to the enactment. And I think that if you — You don't have to. I mean, how could — I understood a distinction which I thought was drawn by the district judge, but that offense was still something that took place prior to enactment. That someone committed and was convicted of this qualifying offense. The statute doesn't say that. And I would direct the court to the examples given in St. Cyr at page 319, note 43, where Congress used language like regardless of when the conviction occurred, it also used language such as shall apply to convictions and sentences entered before, on, or after the date of the enactment of this act. None of that type of language is present in this statute. It merely says has been. Has been does imply the past, but it does not say how far back in the past it goes. This statute, you know, it applies today. People are on parole today. If their parole officer finds out that they are — have just been convicted of some offense that qualifies, then the probation or parole officer is obligated to take the sample. But it doesn't say that the has been language used in this statute extends back in time prior to the enactment. And the Supreme Court has been very specific that when we're talking about retroactivity, that Congress needs to be extremely specific. They use language like the language must be so clear that it can sustain only one interpretation. Here, the district court correctly found that this language was not so clear that it could sustain only one interpretation because it could apply to individuals who are currently in prison, who are currently on parole or supervised release, and who get new convictions for qualifying offenses. That would suddenly create an obligation on the part of the probation officer or the Bureau of Prisons to take the sample. I think that's the conclusion that she reached, and I think that's a correct reading. In fact, if you look at the statute, it's — it does provide even for redundancy. I mean, it says that, you know, that the probation officer or director of the Bureau of Prisons can take a sample even if the person's material is already in the CODIS system. So it seems to contemplate that multiple actors in the criminal justice system could take a sample from the same individual for the same offense. Now, the district court agreed with us — So it's not clearly stated that it's retroactive, but does that end the inquiry? No, it certainly doesn't, Your Honor. And before I leave whether or not it's retroactive, I think another good point that the district court made was there's absolutely no legislative history that supports a retroactive application. She examined it carefully, and I have looked at it as well, and I don't see anything where congressmen or senators or representatives said anything to the effect that the statute is supposed to be retroactive. The only thing the government's been able to point to is the CBO report, and those types of reports are not sufficient, number one, to meet the heightened St. Cyr standard, and this Court has never adopted the use of that type of report with respect to a retroactivity analysis. Well, let me ask you this. Congress enacted this DNA Act under the authority of the Commerce Clause. Right. And does the Commerce Clause apply here? Well, I don't think that it does. I think that Congress said that they were doing it under the Commerce Clause. The government filed a 28J letter citing a Tenth Circuit case. I think it's called PLOTS, that also rather than decide the Commerce Clause issue, decided it on the Necessary and Proper Clause. And I think that really the analysis still gets down to whether or not there is any Commerce Clause hook here, because the Necessary and Proper Clause isn't really the correct basis here, because that has to be from an enumerated power, and our position is that there is no police power, therefore there is no enumerated power to which you could apply the Necessary and Proper Clause. So the question is, is there a Commerce Clause power here to undertake this type of investigative activity when there is no jurisdictional nexus between Federal authority and the offenses that are being investigated? In other words — Except your argument, do we have to tell the FBI to throw out its FBI fingerprint registry? I don't think so, because we're talking about a significant Fourth Amendment intrusion here that is being undertaken that is separate from, say, the booking procedures that the FBI might employ in its process. So what's the Commerce Clause justification for maintaining the fingerprint registry? Well, what we're attacking is not the maintenance of the actual status, but the statute that allows for this investigative activity of taking the samples themselves. We have a statute here that allows a forcible intrusion. They're allowed to hold them down if necessary to take the system. That's what we're challenging, not the actual maintenance of a database, but the actual permission for the FBI or, I guess, actually probation officers. Well, the Federal — he's in Federal custody for a prior Federal conviction. Are you telling me that the Federal Government isn't allowed to take fingerprints, for example, from somebody who happens to be in Federal custody? No, I am — I'm not telling you that. What I'm telling you is, is that this is a procedure that takes place after the person has been convicted of some offense, and there now is a subsequent investigative activity that's being undertaken, gathering evidence for use in criminal prosecutions, and there is no showing that those criminal prosecutions have any Federal nexus. This activity is unrelated to the crime that got the person into supervised release or the Bureau of Prisons in the first place. This is an investigation into other offenses. They want to take this person's DNA and run it across the country to see if they've committed other particular crimes. But if they took a blood sample at the time they fingerprinted the person, would that be all right? Well, I think, you know, then you're going to have the question — people are fingerprinted before they're convicted. So I think that if there was a statute that allowed for the samples to be taken, then Judge O'Scanlan's opinion, which turns on the fact that there's a diminished privacy interest on the part of people who are on supervision, wouldn't apply here. So we'd really have to start anew at that point. Yeah, I would — Did you answer my question? I thought I dodged it well, but — What did you say? I thought I dodged it well. I think that my argument would be a lot less strong under Your Honor's position, because it would be much more like the fingerprinting process that Judge Clifton's talking about. But I still think that a statute that allows this additional intrusion, that in that case, still, in all likelihood, wouldn't be related to the particular offense, because if they really want a DNA — I mean, they get search warrants for DNA. In my case, if they want DNA, they're going to get a warrant for it so they can use it in this case. But if what you're talking about is a DNA sample they want to take to use in other cases, then I think the same analysis would apply. But they use the fingerprints for other cases. That's true. That's true. But I think that what we're talking about is a statute that authorizes this additional intrusion that's not part of the normal booking process. So I think that would make it different, because you'd need a specific statutory grant in order to perform this type of intrusion. But you don't need that in order to do the fingerprint analysis. Well, here Congress put this thing of taking blood samples in interstate commerce, and then legislates the regulation of that. So how does that play out? I mean, does that give Congress — Congress does that? Does that give Congress unrestrained power to the Commerce Clause? I think it does. Usually we're talking about things that move in the other direction, you know, from one state to another, interfering with interstate commerce. But here Congress creates the interstate commerce. I think our argument focuses on the actual collection process, which is effectively a Federal investigation into crimes that are not shown to have been Federally undertaken. So I think it's a step back from the actual database that Congress has ordered to be maintained by the FBI. If I could, I'd like to just briefly address the second step of the land graph. Let me ask you this. What if Congress just — what if a probation officer took a swab of saliva? You know how they do it. Yes. Would that be all right? No, it wouldn't, because I think one of the most persuasive points in Judge Kaczynski's concurring opinion in Kincaid is that we shouldn't focus on just the taking of the sample. You know, we shouldn't just focus on the actual blood draw or the swab, but the use to which it's put, because that's a significant intrusion on the privacy. So I think under those circumstances, we'd have the same argument. I see that I'm — So would that be a search? Yes, it would be a search. It's an intrusion into a person's bodily integrity. So I think it would be a search. It's just not as perhaps onerous as having an actual insertion into your body. But you still have to open your mouth, and they stick something in, and they roll it around. What if they clipped a few hairs off your head? I think it's the same thing. It still is an intrusion on your bodily integrity. So it's a search. And then there's also the privacy implications that Judge Kaczynski talked about in his concurring opinion. Mr. Hubachek, what is the present status of your client? Has he finished serving his supervised release? What happened, Your Honors, was that Mr. Raynard's supervised release was stayed. Stayed? Yes. Did the district court enter a stay order? The district court entered a stay order. Mr. Raynard wanted to move to Alaska. And rather than go through the process of getting approval to change address and whatnot, the district court entered an order staying his supervised release. That way he could move to Alaska and not comply yet with her order that he give up his blood sample. So he was subject to reinstatement? That's correct, for about two months. So if the court rules against Mr. Raynard, he'll have to give up the blood sample, and then two months later his term of release will be over, and then he'll be in the situation that Judge Gould described where the special need never exists, or doesn't exist anymore. I'm over. Can I possibly talk just briefly about the second step of Landgraf? I think there's a couple of important points. Go ahead. Thank you. Number one, Judge Gonzales' opinion completely missed the Hughes Aircraft implications of the new misdemeanor offense that's available. That is a new cause of action that became available after the change in the law, which occurred after Mr. Raynard's guilty plea. So I think that that is a significant retroactive effect, and I think Hughes Aircraft effectively requires that this court find that that is a retroactive effect because there is this new cause of action available. Number two, I disagree with But that new cause of action would be based upon his refusal. Is that correct? And that's an event that takes place after the enactment of the DNA Act. Well, the new cause of action is based upon he had a right at all times prior to the statute to refuse to be able to have this sort of thing undertaken. So I think that it is a new cause of action to the extent that they took away a right from him, and the fact that he no longer possesses that right is what gives rise to the cause of action. So I think that is a retroactive effect. Second, I disagree that there was any authorization to take Mr. Raynard's blood prior to this act. The portion of AEDPA that the district court relied upon, which is AEDPA Section 811A2, does not authorize intrusions into the bodies of supervised releasees or prisoners in order to acquire or actually supervised releasees in order to acquire their DNA material. So the law at the time that Mr. Raynard pled guilty did not allow for him to have this taken. Even if it did, it would have only been taken on a discretionary basis, and the St. Cyr case says that there's a difference between a discretionary result and a mandatory result because the alien in St. Cyr was always subject to deportation. The question is, was he subject to mandatory deportation or discretionary deportation? Even if they're correct and they could have taken Mr. Raynard's blood before, it was only on a discretionary basis for the probation officer. Now it's mandatory. So, again, under St. Cyr, this is a retroactive effect. Lastly, I think that Justice Story's formulation that talks about taking away rights that previously existed, St. Cyr says that's a sufficient showing of a retroactive effect. So under Justice Story's formulation, Mr. Raynard had a right not to subject himself to this sort of testing. He no longer has that. So under the Justice Story test, which was approved in St. Cyr as a sufficient showing of a retroactive effect, Mr. Raynard was, in fact, retroactively affected by the statute. If Your Honors don't have any further questions, I'll submit. All right. Thank you. Good morning. May it please the Court, Mark Rahe for the United States. Your Honors, first I'd like to talk briefly about the Fourth Amendment issue and the precedential value of Kincaid. It's not my intent to re-argue the substantive issues of the Fourth Amendment analysis, but I do believe that even under the test that the defense has provided, that there is a common ground that this Court can discern from Kincaid, and it's quite simply this, that the six members of the Court in that case found that a suspicionless test of a supervisor leasing for the purposes of profiling, making a DNA profile of his blood, is reasonable under the Fourth Amendment. Five judges reached that under a totality of the circumstances announced, whereas the sixth one found it under special needs. That distinction aside, there is still an obvious common ground there that the suspicionless test itself was reasonable under the Fourth Amendment. And I believe in Huggs itself, I know that there were certain claims raised by the defendant there about his Fifth Amendment rights and the grand jury, but it seemed to me from the necessary inference at the end of the first paragraph of the opinion, it appeared that he raised a challenge that that DNA requirement violated his rights. Kennedy. Well, Huggs doesn't, you know, it's not clear. It doesn't really tell us whether there's a Fourth Amendment challenge, does it, Huggs? Well, not as clearly as obviously we would like, but I believe the last sentence of the first paragraph says we also find that this does not violate his right to privacy. And obviously, I know that the briefs are on Westlaw. I don't have a copy of the briefs before me. And this Court can look at those if it finds that issue significant. But I find it hard to believe that the Court would reach out to that issue if it wasn't in fact presented. And it seemed that he had made a claim that it violated his right to privacy. A claim that something violates the right to privacy is in essence a Fourth Amendment claim. On the other hand, as you say, although we don't know why, we know that six members of the Kincade panel upheld, right, the ---- The requirement that that defendant ---- Upheld the requirement under a Fourth Amendment challenge. Correct. For whatever the reason is, it's good law. Under the reasonableness clause, yes, that's our position. So that's basically all I have to say about the Fourth Amendment. Unless the Court has further questions, I would like to turn then to the retroactivity analysis. As the Court knows, that's governed by a two-pronged inquiry. The first step is, has Congress made its intent for retrospective application clear? And the second step is, if not, it's not the end of it. The inquiry, as Judge Pregerson pointed out, then go to sort of this very fact-intensive, common-sense inquiry about whether application of the law violates prior rights, increases a party's liability for past conduct, or imposes new duties with respect to transactions already completed. And the Supreme Court has made clear that fair notice, reasonable reliance, and settled expectations offer sound guidance in analyzing that second step. Now, I'd like to ---- The government will submit on its claims as stated in the brief as to the first step. But we would like to focus our argument today on the second step. And I think it's important. In this case, there are two fundamental things about this defendant's case that make this law okay under the retroactivity analysis. One, from day one since this defendant has been sentenced, he has been subject to a search condition. And that search condition was that he submit to a search of his personal property, residence, abode, or vehicle at a reasonable time and in a reasonable manner. The second condition was that he not commit another Federal, State, or local crime. It's the government's position that these two conditions fundamentally inform Mr. Renard's expectations and gave him no expectation that something like a DNA search could not be forthcoming. And for that reason, the reasons for that are as follows. First of all, I know that the defense, their claim as well, it could only be proper if it was subject or if it was supported by reasonable suspicion. First of all, that language is not in the search condition itself. It just says submit to a search of the person at a reasonable time or in a reasonable manner. Secondly, the Supreme Court in 1989 in the Von Raab case made clear that individualized suspicion is not an irreducible requirement of every reasonable search. That had to have informed Mr. Renard's expectations. And finally, this Court in 1995 in the Rise v. Oregon case specifically upheld a suspicionless DNA search. That was in 1995, three years before the defendant entered his guilty plea in this case. So for him to take the position that, oh, this somehow comes out of left field, I don't believe can be sustained. As the district court put it herself, said this is not a new duty. This isn't something that this defendant didn't see coming. He already had the search condition. And as this Court can see from the record, this defendant basically in the beginning, his performance on supervised release was not positive. He was testing dirty, a lot of dirty drug tests. He was placed in a residential drug treatment facility. So this defendant was already being subject to periodic drug tests, urine tests, which I believe are even more invasive than a one-time blood draw. All of these things had to have informed his expectations. And as far as reliance, I know that my opponent submitted a 20-J letter, I believe, yesterday. Kennedy, did it inform his expectations that he'd be open to an extraction of blood to be used to determine his DNA? I believe so, Your Honor, because it's another search of the body. He is already being subject to intense biological scrutiny, for lack of a better phrase, from the government. He is having to submit to monthly urine tests. This is a one-time blood test. It's a search of the person. The parties have no dispute about that. I mean, I was trying to think yesterday of examples. Let's say there was a new law that says he has to forfeit his car during the time of his supervised release or submit himself to government testing of a new drug. Something like that comes way out of left field, for lack of a better phrase. This, however, is another. It's just a single one-time intrusion. It's reflected as a law that Congress passed that required that all felons carry a card that had an F on it with a strap around the neck. But that might be something different. They may have a cruel and unusual claim under that. That's a shaming kind of situation. I mean, on that situation, I would say that is certainly further removed. I mean, he knew he was a felon. He knew that, you know, that it was public information. So why couldn't we put the mark of a felon on him? Well, you know, again, Your Honor, I mean, there could be all kinds of considerations that inform that. Maybe he has a claim already that by serving his time and submitting to the many rigors of supervised release, he's already fulfilling his debt to society. I mean, that kind of a thing, that's a shaming punishment. I think that's far removed from what we're talking about here as far as a DNA sample, which is another identifying information. I mean, convicted felons, from the very beginning of the process, they have to give up their information left and right, fingerprints, as Judge Clifton pointed out. Their names are kept in multiple files. They have a rap sheet. I mean, I believe, as the Court stated in Rise, once somebody's convicted of a felony, they lose any expectation of privacy in their identity being kept from the State. This is just another example of that. And it's not – I know sometimes the defense uses the phrase that his genetic makeup is suddenly provided to the State. That's not entirely accurate, as Judge Gonzales pointed out. These are junk sites that are taken. It's not part of his DNA that reflects his susceptibility to medical conditions or gives up any other private information on its face. It's just a unique identifying factor that is kept in a database in which – whose uses are strictly circumscribed. As we pointed out, there are privacy protections in place. At the time our briefs were filed, I noticed, that was back in November of 2002, I think the only penalty for unauthorized use was a $100,000 fine. Since then, it's been increased. It's now a $250,000 fine and or imprisonment up to a year. So it's not the kind of imposition where it doesn't inflict the same disability or restraint as, I would say, hanging a sign around your neck 24 hours a day might do. But another one of the factors that governs the second prong is reasonable  Congress hasn't amended the statute to explicitly provide that it's retroactive. In this case? Yes. No, it hasn't, Your Honor. But I don't believe that that's the end of it. And it's true, as my opponent points out, sometimes Congress does. The Justice Department has gone back to Congress, at least on maybe one or maybe two occasions, and asked that the law be clarified. And that was done. Isn't that right? Well, I don't know if I entirely know what you're talking about, Your Honor. I know that the Justice Department has gone back to it and expanded the list of qualifying offenses. I don't know necessarily that they've gone back to ask Congress to clarify whether it should be retroactive or not. I mean, in other instances. Perhaps they have, Your Honor. I'm not aware of any per se. Under the statute, I thought they did. They very well may have. But I would point out here, though, that just because Congress doesn't have such an express provision, that's not — that shouldn't be the end of the inquiry, because, one, that would render the second step of the Landgraf II prong test meaningless. And secondly, Congress is well aware there have been plenty of situations where laws have been given retrospective scope even without such an express provision in the statute. And Congress is just as surely aware of those decisions as it is the ones that say, you know, as long Congress as you say explicitly will give you — will give effect to that intent. So I don't know how far you — Well, you know, this whole business of congressional intent is just a big fiction anyway. I agree with you on that, Your Honor. And I feel, you know, I don't think — And I asked a friend of mine who was at Congress, but said, Jim, did you vote for this bill? Yeah. Well, what was your intent? What do you mean, what was my intent? Well, congressional intent is important. Really? Yeah. Well, what was your intent? He said, my intent was to vote for the bill that gave the environment the greatest protection, period. That was his intent. And the — and the leadership said, this did it. So that's how we voted. That's what happens. True. And I think Judge Gonzales explicitly recognized that. One of her footnotes, she pointed out, you know what could very well have happened here? It could have just been sloppiness. It could have been that there wasn't a quorum with the people who passed the law on retroactivity. It could have been that they all just assumed that it was retroactive. But as this Court knows, this question is ultimately one for the courts. Maybe Congress just decided, we'll let the courts decide this. And I agree. It is somewhat — Yeah, let the courts decide it, and then we all become activists. Well, I'm not an activist because there are rules. There's a road map that goes before us. That's why the Court says, you know, in a big nutshell, it's just a sort of a — you bring, as my opponent says, common sense look to this. You look at what were some of these expectations at the time they committed the crime, and then how would those expectations change later? Look at the St. Cyr case. That was an instance where aliens — the Court found that if there's one thing an alien is worried about when he pleads guilty, it's his immigration status. And that's why the retroactive denial of 212C relief was found to violate the rules under this test, because there was reliance and there was settled expectations. This case is not even close to that. I don't think — nowhere below have we ever had any kind of a claim by the defendant that, you know what, had I known that I would have to give a one-time blood sample, I never would have pled guilty to this — this crime. There's absolutely no showing of that kind of reliance whatsoever. And we're not saying that reliance is the only thing. Judge Gonzales didn't say that there's even a requirement, but it definitely is a factor. Landgraf itself said that. Breyer, what about that Commerce Clause issue that I raised? The Commerce Clause, Your Honor. I believe that this case is maintainable under the Commerce Clause. The whole — my opponent would like to divorce the taking of the blood from what happens to it. The whole purpose of this law wasn't just to take blood for its own sake, but to create a profile, send it to the lab in Quantico, have it analyzed, and then put into this computer database called CODIS. CODIS has stations, I believe, in almost all 50 States. This is something that is meant to travel across interstate lines, in the computer lines, the electronics. I don't have such a good feel for the engineering of it, but I think one thing is clear. When it's on a computer database and it's to be accessed by law enforcement agencies across the country, that is a thing in interstate commerce. And it's somewhat interesting, because as the district court, I believe she was right. Well, I mean, here Congress, in a sense, created the, you know, the nexus with interstate commerce. I mean, we're not talking about businesses going back and forth and, you know, and all that. True. So Congress passes a statute and hooks it onto the Commerce Clause and then regulates that activity. So what are the limits to that power? I'm just going to drink a glass of water. This case, obviously, the cases in the last 10 years have expressed a concern about the limits of the commerce power. If there was one case that I believe does not present a concern, it's this one. This isn't the — this isn't like VAWA, the Violence Against Women Act at issue in Morrison. This isn't regulating guns in school zones. One fundamental thing we have to keep in mind at the outset here, this DNA Act law only applies to people who are already in Federal jurisdiction to begin with, be they inmates in the Bureau of Prisons' custody or supervised releases or probationers under the auspices of the probation office. This defendant pled guilty to bank robberies as underlying crime. There's no dispute that that doesn't violate the Commerce Clause. The other thing I have to point out, and I know I didn't make this argument as well in my brief as perhaps I could have, but the Tenth Circuit certainly did about a year ago in the Plotts case, which my point it did bring up, it's not just the Commerce Clause in a vacuum, Your Honor. It's the Commerce Clause in addition to the Necessary and Proper Clause. And that Necessary and Proper Clause is specifically listed as part of the authority in this case. When you look at the term supervised release, that is part of a sentence for a crime. I don't think — I think it's beyond dispute that Congress has — if Congress has the power to define an underlying offense as a crime, like bank robbery, under the Commerce Clause, which I don't think there's any dispute because there's always a jurisdictional element that the bank be insured by the FDIC, if it can regulate that underlying crime, it can set terms of punishment and or sentence. A term of supervised release is precisely such a thing. And we're not aware of any — and again, that's half of what this Act does, because it makes it independent misdemeanor to refuse blood, but it also makes it — it changes the supervised release laws. To the extent that we're talking about supervised release, that — I'm not aware of any case that's ever struck down Congress's ability to define a term of supervised release under the Commerce Clause. If there was — I think it was a case called Vaughn-Stevens by this Court, which is 774 F. 2nd, 1411. In that case, this Court held that Congress can define a sentence as part of the Necessary and Proper Clause, and that's what you have in this case. Could Congress — say Congress explicitly provided in a statute that all Federal felons, whether they've completed their parole or not, are subject to having blood drawn for DNA purposes? I believe they can. They can. And in fact, I believe that's actually the state of the law now. Because there was an amendment, and it's effective October 30th of this year. But we're getting a call from the Justice Department right now that's going to tell us one way or another. No. Yeah. No, I believe they can, because, and again, the beginning of your question was where are the limits. This isn't about Congress going into — invading a traditional State realm. These requirements only apply to Federal convicts or Federal probationers. I don't think anybody can say — they complete their parole, they finish their probation, they're out. But this was a prior Federal conviction. Yeah, but prior Federal. You've got a bank robber. He completes all of his sentence and his parole, and he's out. Could that — could you — would Congress have the power to pass a law to take a blood It's a good question, Your Honor. I mean, some people may actually try to interpret the law as it stands now as doing that, because when the law says is or has been convicted, if somebody, let's say, comes into Federal jurisdiction today on a nonqualifying offense, perhaps a misdemeanor, but they have a bank robbery conviction from 10 years ago, that, I believe, is under the auspices of this law, and it would be justified by the same arguments that I've presented already. And, in fact, it's interesting. I believe there was a district court case called Miles that was one of the few that went the other way on the Fourth Amendment issue. Half of that opinion is dedicated to this very issue. It was an individual who came into Federal jurisdiction not on a qualifying offense, but who had, I believe, a bank robbery conviction from before. And the Court said that under the plain language of the statute, and the plain language is always the first thing that you look at, he has been convicted of a qualifying offense and, therefore, is proper. But I believe in this case, though, I mean, Congress has tried to circumscribe this. We're talking about somebody, Mr. Renard, it's no dispute that his underlying conviction was properly within Federal jurisdiction. This is a minimal additional requirement. It's not something that the States don't have any concern in treating. Kennedy. But when he withdrew his consent, apparently, after he signed the document, was there a hearing on that? I don't believe so, Your Honor. In fact, it's interesting. When you pointed that out and I looked at the document, there is such a document called DNA Collection Letter of Authorization. It does say at the bottom, I understand the requirements and I agree, and he signs it, but I don't think I have any dispute with the fact that somebody can give consent and then later revoke it. And I believe that is what happened here. And I don't know that, you know, there was an evidentiary hearing on this case. It was rather brief. It was at the conclusion of the argument on whether this statute was unconstitutional. I don't think the issue really ever came up. But aside from that, I see just 20 seconds left. The only thing I would say, unless the Court has any further questions on other issues, I should probably no. All right. We would submit, Your Honors. Thank you. All right. He's left 12 seconds for you. Mr. Raynard, his expectations shouldn't have been any different than the FBI's were. And the FBI thought at the time that Mr. Raynard pled guilty that it couldn't take his blood. The FBI and the Justice Department are the reason that this subsequent statute was passed, because they told Congress, we don't think we have the authority to take these blood samples. So when Mr. Raynard pled guilty, he could very reasonably believe that these samples couldn't be taken from him. Also, with respect to the wording of his search condition, that's the same wording that this Court in Guadagliato held requires a reasonable suspicion standard. So the wording of his search condition incorporated reasonable suspicion. So he had a settled expectation at that point that he wouldn't be searched without reasonable suspicion. And the search condition said nothing about taking his private information and storing it forever, even after his term of supervised release was over. And my reading of the statute says that the only way you can get this expunged is if you can demonstrate that your conviction was reversed. So I think that's entirely different from the expectation that he actually had. And then finally, I think one of the first words out of Mr. Rahe's mouth on the issue of the second step of Landgraf was to quote Justice Story. And again, Justice Story, one of the formulations is, imposes new duties. There just simply is no question that this statute that says that you must submit to or be forced to submit your blood under this statute is the imposition of a new duty. He didn't have it when he pled guilty. He didn't have it when he committed the offense. So there clearly is a retroactive effect here, and the statute itself is ambiguous as to whether or not it applies to convictions prior to its enactment. All right. Thanks. Thank you, Your Honor. All right. The matter will stand submitted. And the Court will adjourn. All rise. This Court is adjourned.
judges: Pregerson,tashima,clifton